Shelia BURRIS

v.

**Wayne MAHANEY, Thomas Mabry, Thomas Mabry and Associates, Inc., and Theo Spivey Nursing Home.**

Civ. A. No. 2-88-0002.

United States District Court,
M.D. Tennessee,
Northeastern Division.

May 3, 1989.

Bill Bush, Richard King, Rural Legal Services of Tenn. Inc., Cookeville, Tenn., for Shelia Burris.

C. Arnold Cameron, Cookeville, Tenn., for Mahaney.

James H. Reneau, Reneau & Reneau, Celina, Tenn., for Mabry and Mabry & Assoc.

## MEMORANDUM

MORTON, Senior District Judge.

Ostensibly an attempt to vindicate constitutional rights through 42 U.S.C. § 1983, this matter constitutes little more than a fight for attorney fees under 42 U.S.C. § 1988. The court does not intend to disparage the serious nature of financial hardship, but the entire cause of action arises

out of a comedy of errors. The comedy of errors in turn results from a simple, blissful ignorance which now appears less than blissful, since the plaintiff charges that the errors reached constitutional proportions. Specifically, the plaintiff claims that the defendants deprived her of fourteenth amendment due process rights when her wages were garnished. Legislative action having mooted the claim for injunctive relief, the plaintiff seeks only damages. In accordance with the following findings of fact and conclusions of law, the court denies the claim and enters judgment in favor of all the defendants, i.e., Thomas Mabry, Thomas Mabry and Associates, Inc., Theo Spivey Nursing Home, and Wayne Mahaney in his official capacity as Sheriff of Jackson County, Tennessee.

## FINDINGS OF FACT

The story begins with a medical doctor by the name of Clarence L. Jones, Jr. Although not a party to this suit, Dr. Jones set the chain of events in motion by requesting an execution to be issued to garnish the plaintiff's wages. Much earlier, in 1985, Dr. Jones had obtained a judgment against plaintiff Shelia Burris in the General Sessions Court for Putnam County, Tennessee. The judgment was for the amount of an unpaid medical bill, $280, plus court costs. The plaintiff then apparently forgot all about the debt until Dr. Jones instituted this garnishment action.

The execution requested by Dr. Jones was issued by the Putnam County General Sessions Court Clerk and forwarded to the Jackson County General Sessions Court Clerk. It was at this point that the parade of errors began.

The Jackson County Court Clerk dutifully filled out the garnishment notice, completely unaware that Tennessee law required the following notice to be attached:

## NOTICE

TO THE EMPLOYER: YOU ARE REQUIRED UNDER T.C.A. § 26–2–216 TO FURNISH THIS NOTICE TO THE JUDGMENT DEBTOR UPON RECEIPT THEREOF.

TO THE DEBTOR: Your earnings have been subjected to the lien of a garnishment which has been served upon your employer. You have the right to apply to the court for an order suspending further garnishments by the same creditor upon such terms as the court may approve. The court clerk shall provide you with necessary forms in making such application or you may wish to seek counsel of a lawyer.

Likewise, the Clerk hadn't the foggiest notion that the federal constitution might have something to say about what notice must accompany the garnishment.

The same was true at the Jackson County Sheriff's Department. The garnishment document was picked up at the Clerk's office as a part of the normal routine. Then, on January 21, 1987, Deputy Sheriff Clifton Long dutifully delivered the document absent the above-mentioned notice to the plaintiff's employer, the Theo Spivey Nursing Home. Defendant Thomas Mabry, administrator of the nursing home, accepted the document on its behalf. Deputy Long then dutifully returned a signed copy of the document, never dreaming anything might be wrong with the service. In fact, no one in the Sheriff's Department had even heard of Tenn.Code Ann. § 26–2–216, nor was anyone aware that some additional notice might be necessary in order to satisfy constitutional requirements.

Completely oblivious to Tennessee statutory requirements or to possible fourteenth amendment requirements, the employer then naturally failed to supply the plaintiff with the notice that the sheriff failed to supply to the employer. The employer did, however, show the plaintiff the same document that the employer received. Among other things, this document stated that "the judgment debtor [has a] right to apply to the court for an order staying further garnishment proceedings and allowing him to pay the judgment in installments." The document also provided the formula for computing the maximum amount of wages which could be garnished. Thus, if the plaintiff had read the document, she would

have known of a general right to contest the garnishment in a judicial proceeding. She would have also known that there were certain limits to the amount of her wages which could be garnished. Unfortunately, the plaintiff added an error of her own to the errors of the others. Although given an opportunity to read the document, she did not bother to give it much more than a glance, thereby voluntarily remaining blind to whatever notice was available to her. Upon the advice of her employer, however, she and her husband did go to see a general sessions court judge about the garnishment. Subsequently, they also spoke to an attorney about getting the garnishment stopped, but apparently no other action was taken until after the plaintiff quit her job approximately a month and a half later.

Meanwhile, the actual task of computing the garnishment deduction was left to Kathleen Graves, the administrator's daughter as well as bookkeeper for the nursing home. It was not an easy task for Ms. Graves, and she was not very thrilled about having to bother with the garnishment. Nevertheless, after a few requests by the plaintiff, Graves finally calculated an amount of $84 for the bimonthly pay period ending January 31, 1987. Upon so informing the plaintiff, the plaintiff responded that she could not afford that much. A discussion ensued. Graves finally suggested $50 per paycheck, and the plaintiff agreed. In accordance with this agreement, Graves then deducted $50 from each of the four paychecks the plaintiff received during the remainder of her tenure at the nursing home.

The plaintiff's gross pay for the period ending January 31, 1987, was $409.94. Withholding tax and FICA deductions reduced the amount to $374.64. Of this amount, up to $89.62 could be garnished under federal law. State law being slightly more favorable to judgment debtors, only $84.20 could be garnished under the applicable Tennessee statute. However, since only $50 was deducted from this paycheck, the statutory limits were obviously not reached, and no claim exists for excessive garnishment of the paycheck for the period ending January 31.

Gross and net pay for the period ending February 15 was $318.06 and $233.16, respectively. The deduction of $50 was again below the federal statutory limit, but it exceeded the $47.54 state statutory limit by $2.46.

The excess was much worse in the third period, ending February 28. Gross pay was $267.75 and net was $236.39. Thus, under federal law the maximum amount that could be withheld was $13.23, and under state law it was only $7.81; yet the $50 deduction was still imposed, resulting in an excessive federal garnishment of $36.77 and an excessive state garnishment of $42.19.

Finally, the plaintiff's resignation resulted in such a small paycheck for the period of March 15 that neither federal nor state law allowed any garnishment. Nevertheless, $50 was again deducted.

Meanwhile, shortly before the first deductions were made but after the garnishment notice had been served, another nursing home employee quit. This employee, Betty Tayse, had been one of the three laundry employees, and thus the nursing home needed additional laundry help. Tommy Mabry, who was the son of the administrator as well as being the plaintiff's supervisor, subsequently approached the plaintiff with the idea of working some extra hours in the laundry in order to help out with the labor shortage. The plaintiff agreed, although her understanding at the time was that it would only last a few days.

In reality, the plaintiff's "changed working conditions" lasted from that time in late January until she left the job in early March. Before this arrangement, the plaintiff basically worked a shift from 7:00 a.m. until 3:30 p.m. Although she had been hired as part-time help, she had actually been essentially working full time on this shift. Upon her agreement to help out with the laundry labor shortage, she was sometimes assigned to a 1:00 p.m. to 9:00 p.m. shift. Under the first day of the agreement, January 28, 1987, she actually worked a double shift, beginning work at 7:00 a.m. and staying until 9:00 p.m. at the

request of Supervisor Tommy Mabry. She was, however, allowed to run home between shifts in order to tell her husband that she would be working the double shift. She agreed to work the double shift because she wanted to help out and because she wanted the extra hours. The nursing home requested the double shift because it needed extra help after losing an employee. The pending garnishment of the plaintiff's wages was in no way the motivation behind the defendant's request that the plaintiff work the extra hours.

The very next day after this first double shift, the plaintiff had to be at work again by 7:00 a.m. Three days later, on February 1, the plaintiff again worked a double shift. This time, however, she was not required to come in to work the next day. During the remainder of February, she apparently worked the 1:00 p.m. to 9:00 p.m. shift on seven days and the 7:00 a.m. to 3:30 p.m. shift on eight days. On two occasions, she was required to come in at 7:00 a.m. after working until 9:00 p.m. the night before. Furthermore, she apparently worked two evening shifts during her brief service in March.

The plaintiff clearly did not like working the evening shifts. She did not like being absent from her children in the evenings, and she did not like the strain of going to work early in the morning after working late in the evening of the prior day. Sometime relatively early in February, the plaintiff expressed her discontent to her supervisor. He indicated that he would try to restore the plaintiff to her normal schedule, but apparently never followed through. The plaintiff also discussed the situation with Graves, but to no avail.

By this time, the nursing home had hired a new part-time person for housekeeping. Graves offered the plaintiff the chance to go back to housekeeping, but indicated that it probably would not be full time. Thus, when faced with the option of getting more hours at worse times, or less hours at better times, the plaintiff unhappily chose to remain under the new arrangement until she quit on March 6, 1987.

General discontent over her hours played a part in the plaintiff's decision to quit, but ultimately the decision was sparked by an angry exchange between the plaintiff and the administrator on March 6. After working two evening shifts on March 3 and 4, the plaintiff did not show up to work on March 5 because her baby was sick. She told her husband, who was unemployed throughout this time, to call the nursing home and inform them that she was not coming in to work. She assumed he did so, but he did not.[1]

When the plaintiff arrived at work the next morning, she found that other employees thought she had quit. After a wait, she was able to talk to the administrator. He demanded an explanation of why she was not at work the day before. She attempted to explain that her husband was supposed to have called, and the essence of the administrator's angry response was that there was no such call and that she was a liar. Ultimately, however, the administrator concluded that she could come back to work, but that she would have to work the hours assigned to her. The plaintiff indicated acceptance of this, went home, cried, and then called the nursing home to say that she was quitting.

---

1. The parties bitterly contest whether or not the husband called the nursing home. However, no evidence based on personal knowledge was introduced to show that the phone call was actually made. The plaintiff does not claim to have been present when the alleged telephone call was placed. In fact, the plaintiff's residence did not even have a telephone. If the husband actually made the call, he would have had to leave the home and the sick baby in order to do so. Thus, the plaintiff naturally would not have been present. Likewise, the plaintiff did not attempt to introduce testimony from the hus-band that he did, indeed, place the call. In fact, there was no testimony from the husband at all, and this despite the fact that a trial spectator identified himself to the courtroom baliff as the plaintiff's husband. Of course, the man was not under oath, and there was no evidence that this was the same husband, but the simple fact remains that there was no evidence that the call was actually made. On the other hand, inferences from documents and testimony on behalf of the defendants point strongly to the conclusion that there was no such telephone call.

The primary reason the plaintiff quit was that she was upset by the administrator's lack of common decency in the way he treated plaintiff during their March 6 meeting. The cumulative effect of discontent over hours also contributed. However, the administrator's ungentlemanly conduct was just that. It was not the outgrowth of frustration at the fact the plaintiff's wages were being garnished. Likewise, the shift in hours was not motivated as revenge for the garnishment. Rather, it was motivated by the need for changes after an employee quit. As a relatively new employee who was hired as part-time help, it was only natural that the plaintiff might have to bear some of the brunt of this labor shortage.

Many months later, in December of 1987, the nursing home finally returned the $94.65 in excessive garnishments to the plaintiff pursuant to an administrative remedy. Thus, the plaintiff has ultimately received a $200 credit against the judgment owed Dr. Jones for the price of only $105.35. Nevertheless, the plaintiff claims the loss of the use of the $94.65 during early 1987 caused severe damages which deserve redress at this time pursuant to 42 U.S.C. § 1983. Specifically, the plaintiff alleges that the excessive garnishments caused her to be unable to provide necessities for her family. This, she alleges, in turn caused significant emotional distress during January, February, and March of 1987. Furthermore, a portion of this may be attributed to financial difficulties stemming from, among other things, excessive garnishments. Two important facts must not be overlooked, however. To a great extent, the damage resulting from the excessive garnishments was mitigated by loans of unspecified amounts from the plaintiff's aunt. Furthermore, the timings of the excessive garnishments are important to a proper understanding of the entire context. The first excessive garnishment was not until after the pay period ending February 15, and this garnishment was only excessive by $2.46. While a loss of $2.46 may be significant to a family undergoing financial difficulties, it cannot be deemed devastating. The second excessive garnishment was serious, however. As noted earlier, the excessive deduction for the pay period ending February 28 was $42.19. For a lady with two small children and an unemployed husband, the deduction of $42.19 from an already meager paycheck would be quite likely to cause serious strain. Yet, whatever strain was caused by the excessive garnishment was also dramatically increased by the plaintiff's own volition just a few days later when she quit her job. This increased strain cannot be attributed to the garnishment.

Of course, the court in no way intends to belittle the problems the plaintiff was encountering. The court is convinced that the general time period was very difficult for the plaintiff emotionally as well as financially. However, it would be both wrong and a grave injustice to lay the blame for all her problems at the feet of the excessive garnishment. The simple fact is that much of the trouble resulted from the plaintiff's husband being unemployed during this entire time, and then from the plaintiff herself giving up her job. If the excessive garnishment caused problems with the plaintiff's ability to provide for her children, the plaintiff's voluntary surrender of biweekly paychecks did so even more. Again, the court does not want to belittle the problem the plaintiff had at work. Neither does the court want to condone the administrator's March 6 temper tantrum, but ungentlemanly conduct does not a constitutional violation make. Likewise, it did not create liability for damages under 42 U.S.C. § 1983.

Additionally, the court does not doubt the plaintiff's claim that she suffered emotional strain as a result of being away from her children at certain times when she felt a "good mother" would have been with them. However, the court also finds that this was completely unrelated to the garnishment. Rather, it stemmed from the fact that the nursing home needed her to work some evenings, and this decision was based upon a labor shortage, not upon the fact that her wages were being garnished. Furthermore, the court notes that at least the plaintiff's husband was apparently

available to be with the children at times when the plaintiff wanted to be there herself. Thus, the emotional distress caused by being away from her children several evenings was presumably mitigated to some degree.

## CONCLUSIONS OF LAW

As already indicated, the plaintiff seeks damages under 42 U.S.C. § 1983. Claims for injunctive relief were mooted by an act of the legislature.

■ A section 1983 claim has several components. First, the plaintiff must have been deprived of a right secured by the United States Constitution or other federal law. Since many federal rights are simply protections against certain state actions, this component will also often contain the subcomponent of state action. Indeed, such is the case for this plaintiff's allegation that she was deprived of her fourteenth amendment rights. Second, the defendant from whom the plaintiff seeks damages must have been responsible for that deprivation. Third, that defendant must have been acting under color of state law when she/he deprived the plaintiff of that right. Of course, this element will often overlap with state action in those cases where state action is required. Finally, the plaintiff must prove damages. Naturally, the plaintiff must also survive the defendant's attempts to prove various affirmative defenses such as qualified immunity or the good faith defense of private parties.

■ The analysis begins with an examination of whether the plaintiff was deprived of a right secured by federal law or the United States Constitution. The plaintiff alleges that she was deprived of her right to be free from a state deprivation of property without due process of law. It appears that the plaintiff may also be alleging deprivation of her rights under the supremacy clause of the United States Constitution. However, "the supremacy clause does not create individual rights that may be vindicated in an action for damages under Section 1983." *Golden State Transit Corporation v. City of Los Angeles*, 660 F.Supp. 571, 578 (C.D.Cal.1987). *See also Mashpee Tribe v. Watt*, 542 F.Supp. 797 (D.C.Mass.1982), *aff'd*, 707 F.2d 23 (1st Cir.), *cert. denied*, 464 U.S. 1020, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983). Logically, therefore, neither does it create a property right protected by the fourteenth amendment. Thus, the fourteenth amendment does not provide a back door for a section 1983 recovery of damages for a supremacy clause violation. Consequently, this court need only be concerned with whether the plaintiff was deprived of her fourteenth amendment right to be free from a state deprivation of her property interest in wages without due process of law.

This alleged deprivation of the plaintiff's fourteenth amendment due process rights may in turn be divided into two separate claims. First, it appears that the plaintiff may still be asserting a claim for violation of substantive due process rights. In case she is, the court will first address this issue. Second, the plaintiff alleges that she was deprived of her fourteenth amendment procedural due process rights. This is the claim upon which the parties have primarily focused.

### A. Substantive Due Process

The essence of a substantive due process claim is that the plaintiff has been deprived of some property or liberty interest of which the taking party has no right to take regardless of the procedures invoked. In this case, the plaintiff could be perceived as alleging that the defendants deprived her of two property interests which could not be taken from her regardless of the procedures applied. First, the plaintiff may have been alleging a substantive due process violation by virtue of a "taking" of her interests under the supremacy clause. This theory has already been rejected by the court. Second, the plaintiff may still be alleging that a substantive due process violation occurred when wages in an amount greater than statutory garnishment limits were taken from her.

■ True, 15 U.S.C. § 1673 does set a maximum limit upon the amount of wages

which can be garnished. Furthermore, for purposes of the present analysis, no greater amount may be garnished regardless of the procedures invoked by the creditors. Thus, the facts of this case would at first glance appear to fit within the analytical framework of a substantive due process claim. Stopping the analysis at this point, however, fails to give proper consideration to the nature of the rights created by 15 U.S.C. § 1673. As this court stated in its memorandum opinion of November 6, 1988, there is no implied private cause of action for damages resulting from a violation of 15 U.S.C. § 1673. Although dealing with a provision in a different subchapter of the Consumer Credit Cost Disclosure Act, the Sixth Circuit may be seen as having given some guidance on this issue in *Smeyres v. General Motors Corporation*, 820 F.2d 782 (6th Cir.1987). In *Smeyres*, the Sixth Circuit adopted the district court's reasoning in *Smeyres v. General Motors Corporation*, 660 F.Supp. 31 (N.D.Oh.1986). The district court concluded that there was no private cause of action for violations of 15 U.S.C. § 1673 which appears in part E of subchapter 2 of the Act. In the process, the court noted that the majority view was that there was no private cause of action for violations of subchapter 2. This court agrees with this majority view. *See, e.g., McCabe v. Eureka*, 500 F.Supp. 59 (E.D. Mo.1980), *aff'd*, 664 F.2d 680 (8th Cir.1981); *Smith v. Cotton Brothers Baking Co.*, 609 F.2d 738 (5th Cir.1980), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).

■ If there is no implied private cause of action for a violation of 15 U.S.C. § 1673, it is also only logical that there can be no section 1983 action for violation of 15 U.S.C. § 1673. The basic reason the courts have concluded that there is no implied private cause of action is that Congress apparently intended the accompanying administrative remedy to be the exclusive remedy for a section 1673 violation. To allow a section 1983 action for violating the garnishment provision would simply be an avoidance of the congressional intent that the administrative remedy be exclusive. Furthermore, a fourteenth amendment violation requires a deprivation of a property (or life or liberty) interest. If there was no private right to enforce section 1673 outside of the administrative remedy, then the plaintiff cannot complain that she was deprived of a substantive federal right created by 15 U.S.C. § 1673. *Follette v. Vitanza*, 658 F.Supp. 492 (N.D.N.Y.1987), further supports this view. In *Follette*, the court specifically states that "Congress intended to foreclose private enforcement of 15 U.S.C. § 1673 through a civil suit instituted under 42 U.S.C. § 1983." *Id.* at 500. Accordingly, the court holds that there can be no recovery for an alleged substantive due process violation. In fact, the court is not sure whether the plaintiff was still asserting this theory by the time of trial, but if she was, that theory is now rejected.

■ At the same time, however, the court rejects the defendants' attempts to use *Follette* to extinguish this entire action. The defendants argue that *Follette* stands for the proposition that the plaintiff has no standing whatsoever to bring a section 1983 action based on the events surrounding the garnishment. They also claim the plaintiff is estopped from pursuing a section 1983 remedy since she successfully pursued the available administrative remedy. In essence, these standing and estoppel arguments are one and the same, just clothed in different language. They also represent a misreading of *Follette* and a misunderstanding of the significance of the fact that Congress did not intend to create a private remedy when it enacted 15 U.S.C. § 1673.

As already discussed, two distinct wrongs are alleged to have occurred in this case. One is the garnishment of exempted wages. However, as just indicated, no section 1983 action may be brought to recover damages for this wrong. The basic rationale behind this is that Congress intended the administrative remedy to be the exclusive remedy. This in no way means, however, that there can be no section 1983 recovery for the completely separate "wrong" of violating the dictates of the fourteenth amendment by not giving adequate notice. By providing an exclusive

remedy for wrongful excessive garnishments pursuant to 15 U.S.C. § 1673, Congress was certainly not intending to create an exclusive remedy for all procedural due process violations occurring during a garnishment.

Although not deciding the issue, the court notes another potential problem with the substantive due process claim. An argument can be made that there was no state action involved in the deprivation of wages in excess of statutory limits. The state did not seize those wages which were not garnishable. Neither did it want or encourage the private defendants to do so. In fact, the state's instructions were that no wages were to be deducted beyond that allowed by the formula on the garnishment notice. The excessive garnishment was simply a failure of a private party to obey those instructions. It is a settled proposition of law that "private misuse of a statute does not describe conduct that can be attributed to the state." *Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482, 498 (1982). Whether this rule is rendered inapplicable by the fact that the private parties were ordered to make some deductions is a question for some other day in another case.

### B. Procedural Due Process

Having determined that the plaintiff may not recover for a substantive due process violation, the court now turns to the more critical procedural due process claim. This claim is based upon the allegation that the plaintiff was denied constitutionally mandated "notice of the existence of exemption rights created by federal and state law [and] of any procedure for contesting the garnishments." Thus, the court's duty is to compare the notice actually received by the plaintiff with the notice requirements of the fourteenth amendment. Since the class action claims for injunctive relief were mooted by new legislation, this court need not consider whether the "old" Tenn. Code Ann. § 26–2–216 was constitutional. All parties admit that the notice received by the plaintiff was different from the notice required by the statute. Furthermore, violations of state-mandated procedures do not in and of themselves constitute violations of the fourteenth amendment due process requirement. *See Eguia v. Tompkins*, 756 F.2d 1130, 1137 (5th Cir.1985). Accordingly, the court need only be concerned with whether the plaintiff's actual notice was constitutional.

■ First, the court holds that the plaintiff must be attributed with notice of the contents of the garnishment document. She was undoubtedly given an opportunity to read the notice. The fact that she did not read the entire document was her personal error, and she must not be allowed to shift the blame to another party. Thus, she must be deemed to have read the following:

Upon the garnishment of salaries, wages or other compensation due from the employer garnishee, the garnishee shall:

1. Pay the judgment debtor the amount of his exempt salaries, wages or other compensation.

2. Submit as a part of his answer to the garnishment a statement of judgment debtor's independent children under 16 years of age who are residents of this state.

3. Furnish the judgment debtor the written notice of his right to apply to the court for an order staying further garnishment proceedings and allowing him to pay the judgment in installments, which notice shall be affixed to the garnishment summons at the time it is served upon the garnishee.

4. To the extent of the amount due upon the judgment and costs, the employer garnishee shall hold, subject to the order of the court, any non-exempt wages due or which subsequently become due.

. . . .

THE MAXIMUM PART OF THE AGGREGATE DISPOSABLE EARNINGS OF AN INDIVIDUAL FOR ANY WORK WEEK WHICH IS SUBJECTED TO GARNISHMENT MAY NOT EXCEED:

(a) twenty-five percent (25%) of his disposable earnings for that week; or

(b) the amount by which his disposable earnings for that week exceed thirty (30) times the federal minimum hourly wage at the time the earnings for any pay period become due and payable, whichever is less. In the case of earnings for any pay period other than a week, an equivalent amount shall be in effect.

"DISPOSABLE EARNINGS" means that part of the earnings of an individual remaining after the deduction from those earnings of any amounts required by law to be withheld.

---

THIS GARNISHEE CERTIFIES that this employee has _____ dependent children under the age of 16 years and who are residents of the State of Tennessee.

GARNISHMENT ANSWER

---

1. During the pay period from ___ to date of service of this garnishment, Employee earned ... $___
2. Less:
   a. Social Security ............. $___
   b. Withholding Tax ............ $___
   c. Total of 2a and b .......... $___
3. Amount subject to Garnishment (Item 1 less Item 2).......... $___
4. Exemption of $2.50 per week for each dependent child under 16 in the State of Tennessee .... $___
5. Net amount subject to garnishment (line 3 less line 4) ...... $___
6. The greater of 75% of line 5, or (30) times the Federal Minimum Hourly Wage ................ $___
7. Amount not exempt and being held subject to court order, or paid into court herewith, (line 5 minus line 6) ................ $___

The question is whether this "notice meets minimum constitutional requirements.

Obviously this notice would be more than sufficient if the old rule of *Endicott Corp. v. Encyclopedia Press*, 266 U.S. 285, 45 S.Ct. 61, 69 L.Ed. 288 (1924), should be applied to these facts. In *Endicott*, the Supreme Court stated as follows:

[T]he established rules of our system of jurisprudence do not require that a defendant who has been granted an opportunity to be heard and has had his day in court, should, after a judgment has been rendered against him, have a further notice and hearing before supplemental proceedings are taken to reach his property in satisfaction of the judgment. Thus, in the absence of a statutory requirement, it is not essential that he be given notice before the issuance of an execution against his tangible property; after the rendition of the judgment he must take "notice of what will follow," no further notice being "necessary to advance justice."

*Id.* at 288, 45 S.Ct. at 62. Since 1924, the Supreme Court has never again specifically addressed the issue of what procedural protections must be granted to a judgment debtor whose property is being garnished or otherwise seized. However, as pointed out by a number of lower courts when dealing with post-judgment garnishments or attachments of property, due process jurisprudence has undergone substantial development since 1924. *See Finberg v. Sullivan*, 634 F.2d 50, 57 (3rd Cir.1980); *Follette v. Vitanza*, 658 F.Supp. 492, 510, 511 (N.D.N.Y.1987); *Deary v. Guardian Loan Co., Inc.*, 534 F.Supp. 1178, 1185, 1186 (S.D.N.Y.1982); *Neeley v. Century Finance Co. of Arizona*, 606 F.Supp. 1453, 1461 (D.Arizona 1985); *Clay v. Edward J. Fisher, Jr., M.D., Inc.*, 584 F.Supp. 730, 732 (S.D.Ohio 1984).

Most importantly, the central approach to procedural due process theory has shifted to the following balancing approach articulated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, 33 (1976):

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail.

Similar balancing of interests has been used by the Supreme Court in several cases involving prejudgment property seizures. *See Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). But, as already indicated, we do not have the benefit of a recent Supreme Court analysis of a postjudgment garnishment case.

Jurisprudential developments or not, this court is still bound by holdings of the Supreme Court. Thus, if the facts of this case were identical to the facts of *Endicott*, this court would be bound to deny the plaintiff any remedy. However, as pointed out by the Third Circuit in *Finberg, supra,* "the [*Endicott*] Court did not consider the possibility that the garnishment might deprive the judgment debtor of exempt property." *Finberg*, 634 F.2d at 56, 57. Since the *Endicott* era, federal and state legislation has created substantial limitations on what property may be garnished. As this case demonstrates, the existence of these exemptions create a possibility that postjudgment garnishments may deprive the debtor of property which is not legally garnishable. This is a far cry from the cut and dried situation in *Endicott.* Accordingly, under the facts at hand, the court concludes that it must apply the *Mathews* balancing test. In applying the test, the ultimate goal is simply to ensure that the plaintiff has notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *See e.g., Goldberg v. Kelly*, 397 U.S. 254, 267, 268, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287, 299 (1970); *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

Courts applying the *Mathews* balancing test to postjudgment garnishments appear to be in unanimous agreement concerning certain basics. All agree that due process at least requires that the judgment debtor be informed of the garnishment, of the existence of exemptions, and of procedures to assert those exemptions or challenge the garnishment. *But see Langford v. Tennessee*, 356 F.Supp. 1163 (W.D.Tenn.1973) (no balancing and no notice required at all). Of course, these cases have also required the existence of adequate procedures for challenging the garnishment, but the procedures themselves have not been challenged in this case. Rather, the plaintiff simply attacks the notice.

This court does not disturb the near unanimity of the conclusion that due process requires notice of the garnishment, the exemptions, and challenging procedures. When the *Mathews* balancing test is applied to the realities of modern-day garnishments, no other conclusion is reasonable. Certainly the "private interest that will be affected" is very significant as far as the judgment debtor is concerned. As the *Deary* court stated, "[t]he exemptions ... are designed to protect [the debtor's] means of purchasing the basic necessities of life." *Deary*, 534 F.Supp. at 1178. The deprivation of relatively small amounts of money which should be exempted from deprivation can be very critical to a family with limited income. Of course, the judgment creditor also has a significant interest in obtaining payment from wages that are garnishable, but this interest stops where the maximum statutory limit begins. Thus, consideration of the first *Mathews* factor points strongly toward notice of the exemptions and of the opportunity to assert them.

The same is true for the second *Mathews* factor. Without such a notice, an erroneous deprivation of the private interest seems quite possible. Yet, this possibility drops dramatically if the notice is given. To the extent the possibility still exists, its occurrence can usually be attributed to some other error or lack of effort. Hence, this court concludes that the "probable value" of the "additional safeguard" of basic notice of the exemptions and of procedures

to assert the exemptions is quite high, thereby indicating they should be implemented.

The third *Mathews* consideration is the governmental interest. Unquestionably, there is at least some burden upon the government in providing this notice. However, since it may easily be incorporated into a document which the government provides anyway, the court concludes with all other courts addressing the issue, that this burden is outweighed by the competing interests.

■ Although this conclusion would render the former Tenn.Code Ann. § 26–2–216 unconstitutional, it still does not answer whether the plaintiff's due process rights were violated. Notice in accord with Tenn. Code Ann. § 26–2–216 would not have informed the plaintiff of her exemption rights. The notice the plaintiff did receive, however, not only informed the plaintiff of the existence of the exemptions, but also provided the complete formula for computation of the garnishable amount. Thus, the only real issue is whether the plaintiff received adequate notice of her opportunity to contest the garnishment or assert those exemptions.

If due process merely requires that the plaintiff be given notice of the existence of a procedure by which to challenge the garnishment, due process was given in this case. The document the plaintiff is deemed to have read stated that the "judgment debtor [has a] right to apply to the court for an order staying further garnishment proceedings and allowing [her] to pay the judgment in installments." The plaintiff contends, however, that more details are necessary.

On this issue, there is less guidance from other courts. Most of the cases concerned factual situations in which there was no notice whatsoever. Therefore, the courts only had to determine that notice was necessary, not the degree of detail necessary. *See Finberg v. Sullivan,* 634 F.2d 50 (3d Cir.1980); *Deary v. Guardian Loan Co., Inc.,* 534 F.Supp. 1178 (S.D.N.Y.1982); *Clay v. Edward J. Fisher, Jr., M.D., Inc.,* 584 F.Supp. 730 (S.D.Ohio 1984); *Harris v.*

*Bailey,* 574 F.Supp. 966 (W.D.Va.1983); *Dionne v. Bouley,* 583 F.Supp. 307 (D.R.I. 1984). Only *Neeley v. Century Finance Co. of Arizona,* 606 F.Supp. 1453, 1465 (D.Ariz.1985), expressly concluded that "due process requires that the procedures to seek judicial review of the garnishment be set forth in detail." *Green v. Harbin,* 615 F.Supp. 719 (D.C.Ala.1985), also resulted in an order requiring detailed information about the procedures, but this was pursuant to a consent decree, albeit one opposed by one member of the defendant class.

On the other hand, in *McCahey v. L.P. Investors,* 774 F.2d 543, 550 (2d Cir.1985), the Second Circuit expressly rejected the claim that "the notice should provide specific information about the time, place, or method for making a motion to perfect the exemption claim and obtain[ing] a protective order." The notice approved in *McCahey* simply informed the debtor that a procedure was available, cited the relevant statute, and advised that legal help was available. The notice given the present plaintiff was more explicit! The present plaintiff was informed that she had a "right to apply to the court for an order staying further garnishment proceedings and allowing [her] to pay the judgment in installments." Unlike the *McCahey* notice, there was no written notification of the availability of legal help, but the plaintiff was advised by her employer to seek legal advice, and she did in fact see an attorney before any wages were deducted from her paycheck. Earlier, she even met with a judge.

Admittedly, the *McCahey* notice was written in language more carefully aimed at the debtor. The plaintiff's notice did not carry such things as captions stating "NOTICE TO JUDGMENT DEBTOR." Neither was the writing in the second person. Nevertheless, the fact remains that the plaintiff was given general notice that challenging procedures existed, and she was directed where to start the challenge if she so desired. As *McCahey* indicates, the due process clause does not require more. *See also Follette v. Vitanza,* 658 F.Supp. 492,

514 (N.D.N.Y.1987) (due process requires "that notice of that particular exemption in some form must be provided, as well as *a more general notice that mechanisms to challenge the terms of income executions in general exist.*") Accordingly, the court concludes that the plaintiff was not deprived of procedural due process. She had the notice necessary to give her the opportunity to be heard in a meaningful time and manner. Ultimately, this is all the constitution requires. It may be that the plaintiff received bad advice from the attorney and the judge from whom she sought counsel before the actual garnishment began, but this blame cannot be attributed to a lack of due process.

It is true that the written notice could have been drafted better. It is also true that incorporating better language within the garnishment document would not be very burdensome to the government. Nevertheless, due process is a very fact-specific and flexible inquiry. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). On the facts of this case, the court simply cannot conclude that drafting changes would have made any difference. The plaintiff knew of limits upon the amount of her wages that could be garnished. She also knew of the availability of a process to challenge the garnishment. She was also advised to seek legal advice, which she did. Under the circumstances, the due process clause requires no more. The due process clause merely dictates that the party receive an opportunity to be heard in a meaningful time and manner. In this case, the plaintiff received this opportunity. The due process clause does not require that notice be constructed in the best possible manner. To hold otherwise would invite undue judicial intrusion into the province of the legislature and would force the courts to tinker with every legislative attempt to draft the wording in a statute. This court is satisfied that the plaintiff's notice met minimum standards for an opportunity to be heard within a meaningful time and in a meaningful manner. The fact that the plaintiff's subsequent chosen course of action did not prevent an excessive garnishment resulting from the plaintiff's agreement to a different formula for the deduction computation does not mean that the defendants violated the plaintiff's constitutional rights.

■ Even if the notice did not meet constitutional standards, the private defendants, Thomas Mabry, Thomas Mabry and Associates, Inc., and Theo Spivey Nursing Home have proven a good faith defense. In *Duncan v. Peck*, 844 F.2d 1261 (6th Cir.1988), the Sixth Circuit granted summary judgment in favor of a private defendant who had instituted a prejudgment attachment in good faith reliance upon advice from his attorney. The rationale underlying this good faith defense is even more applicable when a private person is acting pursuant to some order of the government. It is important to note that the private defendants in this case were not "willing participants" in this garnishment process. *Cf. Acickes v. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142, 151 (1970). Most actions for due process violations stemming from garnishments or attachments are against state officials and/or the instigating creditors. Yet, the private defendants in this action are the garnishees—parties who would have preferred that there never had been any garnishment. They did not want to get involved. Yet, the state ordered them to become involved. This being the case, the principles of *Peck* and fundamental justice mandate that they be able to rely on those state orders without fear of being liable for violation of some unknown constitutional rights. Of course, the story might be different had there been malice or reason to know of constitutional defects. In this case, however, there was no such malice, knowledge, or imputed knowledge. The private defendants' failure to give any additional notice was in complete good faith reliance upon government instructions. Accordingly, they would not be liable under 42 U.S.C. § 1983 even if there had been a due process violation.

It is, of course, true that the private defendants did not obey the state's instructions concerning the amount of wages to be

withheld, but that is a different violation which has been addressed earlier in this opinion. The failure to provide adequate notice, however, was in good faith reliance upon the state. Furthermore, this good faith defense is not destroyed by the failure to provide the notice mandated by Tenn.Code Ann. § 26–2–216. The only instruction received by the private defendants was to give the plaintiff the notice attached to the garnishment notice. Since there was no such attached notice, the private defendants cannot be held responsible for supplying it. Furthermore, the private defendants did provide the plaintiff with an opportunity to read the garnishment notice served upon the employer, and this provided a better notice than the statutorily required notice, anyway. True, the plaintiff did not read the entire document, but she could have if she had been willing to spend the time to do so. Thus, the court holds that the private defendants gave all the notice for which they may be held responsible under the circumstances.

■ On the other hand, had this court held that the notice was constitutionally deficient, the sheriff would not be able to escape under cover of good faith qualified immunity. This suit is against Sheriff Mahaney in his official capacity only. Thus, the suit is actually an action for damages from the treasury of Jackson County, Tennessee. Qualified immunity apparently does not apply under these circumstances. Certainly the defendant has not cited any cases to support the proposition that qualified immunity can prevent county liability for the county's unconstitutional acts. Furthermore, Mahaney's acts were ministerial, and "[i]mmunity generally is available only to officials performing discretionary functions." *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396, 409 (1982). The basic idea behind good faith qualified immunity is that discretionary acts of public officers must not be unduly deterred by the threat of liability. To the extent that the officer has no choice but to do a certain act, such as when a state requires him to perform some ministerial duty, this underlying rationale is irrelevant. Likewise, while fear of state treasury liability may have some chilling effect upon an official's discretionary acts, it is nothing compared to fear of personal liability. Thus, when the suit is directed only against the state, or county as in this case, and when the alleged wrong stems from a mere ministerial act, there is no reason why the county should not be held accountable for its constitutional violations.

Because of its holding, the court does not address the significance of *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) and *Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The court does note, however, that were it to determine constitutional violations did occur, it would assess damages in the amount of $150. This represents damages stemming from the temporary loss of use of the $94. It includes compensation for the emotional distress caused by the financial limitations. It does not, however, incorporate damages from changed working hours because the court finds that these changes were completely unrelated to the garnishment. Thus, even if there was a due process violation, that violation did not proximately cause any damages which might have resulted from the plaintiff's changed working hours.

For the foregoing reasons, judgment will be entered in favor of the defendants. An appropriate order will be entered.